UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHANIE CHRISTOFF,

                      Plaintiff,

- against -                         10-CV-8505 (CS)

SATURN BUSINESS SYSTEMS, ALAN KRIEGER,       **OPINION AND ORDER**
GEORGE PAPPAS, and LOU SIEGEL,

                      Defendants.

---

Appearances:
Stephanie Christoff
White Plains, New York
Pro Se *Plaintiff*

Andrew W. Singer
Matthew J. Sinkman
Tannenbaum Helpern Syracuse & Hirschtritt LLP
New York, New York
*Counsel for Defendants*

Seibel, J.

      Before the Court are the Motion for Summary Judgment of Defendant Saturn Business Systems ("Saturn"), Alan Krieger, George Pappas, and Lou Siegel (collectively "Defendants"), (Doc. 63), and the Motion for Summary Judgment of Plaintiff Stephanie Christoff, (Doc. 80). For the following reasons, Defendants' Motion is GRANTED and Plaintiff's Motion is DENIED.

**I.    Background**

      A.    Procedural Background

      Plaintiff filed her Complaint in this action on November 10, 2010, alleging that she suffered discrimination on the basis of her gender and retaliation for protected activity in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYHRL"). (Doc. 1.)

At a conference on January 23, 2012, I granted Defendants permission to make a motion for summary judgment and set a briefing schedule for the motion. (Minute Entry Jan. 23, 2012.) At that conference, I explained the nature of summary judgment to Plaintiff and told her that to oppose Defendants' motion, she would have to produce evidence demonstrating that Defendants' actions were taken based on her gender. The parties then attempted to resolve the case through mediation, and at Defendants' request and Magistrate Judge Smith's suggestion, I extended the briefing schedule until after the mediation concluded. (Doc. 54.) On June 14, 2012, Defendants filed their Motion for Summary Judgment, (Doc. 63), and served Plaintiff with a copy of the Motion and supporting papers, the Local Civil Rule 56.2 Notice to *Pro Se* Litigant Who Opposes a Motion for Summary Judgment, and copies of Local Civil Rule 56.1 and Fed. R. Civ. P. 56, (*see* Docs. 70-71).

Plaintiff did not submit an opposition to Defendants' Motion. On June 29, 2012, she filed a Motion for Summary Judgment. (Doc. 80.) She did not include a statement pursuant to Local Civil Rule 56.1 (a "56.1 statement"), a response to Defendants' 56.1 statement, or a personal affidavit. By letter dated July 9, 2012, Defendants asked that I reject Plaintiff's Motion because she failed to request a pre-motion conference in accordance with my individual practices and failed to submit a 56.1 statement. (Doc. 81.) They also requested that in the event that I decided to consider Plaintiff's Motion as a cross-motion for summary judgment, I allot Defendants more time to respond. (*Id.*) I endorsed the letter, advising Plaintiff of the following: (1) that "as explained in Doc. 70 (Notice to Pro Se Litigants), any facts she submits must be in

2

sworn (affidavit) form – statements made only in a memorandum of law do not count"; (2) that she must respond to Defendants' 56.1 statement in a separate response document or else Defendants' statements may be deemed admitted; and (3) if Plaintiff wishes to move for summary judgment, she must submit her own 56.1 statement. (Doc. 81.) I granted Plaintiff an extension of time to submit her 56.1 statements and any reply on her cross-motion. (*Id.*) As of the date of this Opinion and Order, Plaintiff has not submitted any additional papers to oppose Defendants' Motion or support her own Motion.[1]

Where a nonmoving party fails to respond to a 56.1 statement, the court may "conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see* Fed. R. Civ. P. 56(e)(2); Local Civil Rule 56.1(c). "*Pro se* litigants are not excused from this rule." *Riddick v. Thomas*, No. 11-CV-2986, 2012 WL 919328, at *1 (S.D.N.Y. Mar. 15, 2012).[2] "In the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met." *T.Y.*, 584 F.3d at 418. Here, where Plaintiff has submitted only her own Motion (unaccompanied by a 56.1 statement), I will consider her Motion as both an opposition to Defendants' Motion and an independent Motion, and I will construe her papers "liberally and interpret[] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original) (internal quotation marks omitted). Furthermore, in evaluating the Motions, I will examine the record to determine if any material issues of fact remain for trial. *See Buckley v. Cnty. of Suffolk*, No. 10-CV-1110, 2013 WL 122972, at *1 (E.D.N.Y. Jan. 9, 2013) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,

---

[1] Plaintiff has submitted various letters, (*e.g.*, Docs. 82, 83, 85, 86, 88, 91), which I have considered to the extent relevant.

[2] Plaintiff will be provided with copies of all unpublished decisions cited in this Opinion and Order.

373 F.3d 241, 244 (2d Cir. 2004)); *see also Riddick*, 2012 WL 919328, at *3 ("Where . . . plaintiff has failed to submit any facts in opposition to defendant's motion for summary judgment, this Court 'must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.'") (quoting *Vt. Teddy Bear*, 373 F.3d at 244).

B.   Factual Background

As noted above, Plaintiff has not submitted a 56.1 statement or a response to Defendants' 56.1 statement. Moreover, her only statements of fact – those in her Memorandum of Law – are not sworn statements and are generally not supported by citations to the record. *See* Fed. R. Civ. P. 56(c)(1)(A); Local Civil Rule 56.1(d). Accordingly, I accept as undisputed for the purposes of these Motions all of the statements in Defendants' 56.1 statement to the extent they are supported by citations to admissible evidence.[3]

Saturn is a company that sells computer hardware and software. (Ds' 56.1 ¶ 1.)[4] Defendant Alan Krieger is the president and an owner of Saturn, (*id.* ¶ 2), and Defendant George Pappas was a sales manager and Plaintiff's direct supervisor at all relevant times, (*id.* ¶ 3). Defendant Lou Siegel has been a sales representative at Saturn for approximately twelve years. (*Id.* ¶ 4.) Prior to her employment at Saturn, Plaintiff worked as a salesperson for IBM, and one of her customers there was Lockheed Martin ("Lockheed"). (*Id.* ¶ 5.) Saturn hired Plaintiff in part based on the relationships she developed with customers while at IBM, including her relationship with Lockheed. (*Id.* ¶ 6.) Pappas interviewed Plaintiff for a job at Saturn in the

---

[3] While the facts set forth below are taken primarily from Defendants' 56.1 statement, the Court has conducted a thorough review of the record and has based its decision on all of the information in the record – including Plaintiffs' deposition – not just the facts set forth here.

[4] "Ds' 56.1" refers to Defendants' Local Civil Rule 56.1 Statement of Material Facts. (Doc. 62.)

spring of 2005 and with Krieger's approval, offered her the job of sales representative. (*Id.* ¶ 7.) Plaintiff started working for Saturn on or around May 2, 2005. (*Id.*)

### 1. Issues with Plaintiff's Performance

Plaintiff's sales declined in 2008 and 2009 during her employment at Saturn. (*Id.* ¶ 8; Krieger Aff. ¶ 5.)[5] After receiving complaints from Lockheed about Plaintiff's service, in April 2009, Pappas attempted to speak with Plaintiff on the phone about her performance, but Plaintiff hung up on him. (Ds' 56.1 ¶ 9.) Pappas then emailed Plaintiff, copying Krieger, warning her about her insubordination and expressing his concerns about her relationship with Lockheed. (*Id.*) Plaintiff and Pappas had several other exchanges about the Lockheed situation via email and phone during which Plaintiff stated that she felt Pappas was being "argumentative" and Pappas indicated that he was "very upset with [Plaintiff] as a sales rep." (*See generally* Krieger Aff. Ex. D; Ds' 56.1 ¶ 9.)

According to Defendants, Plaintiff also made mistakes handling IBM, Saturn's "most important business partner." (Krieger Aff. ¶ 7.) On May 14, 2009, an IBM employee emailed Pappas about Plaintiff, stating that "my day was filled with comments of amazement from the people getting . . . emails [from Plaintiff] that this person still has a job. It is going to be very difficult establishing credibility and finding anyone willing to engage themselves or their contacts with this rep." (Ds' 56.1 ¶ 10.) A few days later, the same IBM employee emailed Plaintiff with questions regarding support she was providing and Plaintiff responded, "Please do not tell me how to do my job." (*Id.* ¶ 11.) The employee forwarded this email to Pappas, mentioning Plaintiff's "attitude." (*Id.*)

---

[5] "Krieger Aff." refers to the Affidavit of Alan Krieger. (Doc. 72.)

2.  Plaintiff's Complaints about the Webinar Login

From October through December 2009, Plaintiff complained to Pappas and others about the fact that when using Saturn's webinar technology, her login information identified her to other participants as "Liz Pagan," another Saturn employee. (*Id.* ¶ 12.) All Saturn employees were subject to this policy because of the expense the company would incur from providing individual accounts for each employee. (*Id.*) On December 3, 2009, Plaintiff raised the webinar issue with Pappas for the third or fourth time via email, and also emailed other employees about the issue, stating: "Gee, would you want to make an . . . investment with a company . . . that you can't figure out who your sales person is? . . . That makes such a first great [*sic*] impression doesn't it?" (*Id.* ¶ 13.) After Plaintiff emailed that she would not schedule any webinars until the login was changed, Pappas responded with the suggestion that Plaintiff simply explain to her customers that Liz Pagan was the Saturn administrator who coordinates all webinars. (Krieger Aff. Ex. F, at SBS01560-61.) Plaintiff wrote to Pappas the next day, copying five other employees. She criticized Pappas as a manager, opined that he should not be compensated from Plaintiff's sales, complained about the "aggravation" that she had endured, and stated that "I can manage myself and I don't need Management if the two times I ask for [its] assistance, [it does] not take the action necessary in a reasonable timeframe. Have a great day!" (*Id.* Ex. F, at SBS01560.)

Plaintiff also alleges that Pappas generally "bullied" her through his behavior, but admits that she believed this behavior was part of his "aggressive, New York personality that could be bullying" and that he interacted in a similar fashion with other employees, including Siegel. (Ds' 56.1 ¶ 14.)

3.     <u>Miscellaneous</u>[6]

Plaintiff alleges that Siegel became angry when she made a particular sale and as a result, he punched a wall.  Plaintiff, however, did not see him punch anything and admits that the alleged punching noise could have been made by anyone.  (*Id.* ¶ 15.)

Plaintiff also alleges that Saturn did not reimburse her for a meal with a friend during a business trip, on which she had saved Saturn money by staying with the friend.  According to Defendants, the meal was not business-related and Saturn does not reimburse employees for such meals.  (*Id.* ¶ 16.)

Plaintiff requested that she be sent to a Tivoli software training event in Las Vegas but that another employee, Dan Fitzgerald, was sent instead.  (*Id.* ¶ 17.)  Defendants state that Fitzgerald was sent because he was hired specifically to sell software, and in particular, Tivoli software.  (*Id.*)

Plaintiff made a sale to Lockheed in November 2009, but Lockheed did not pay the invoice until January 15, 2010.  (*Id.* ¶ 18.)  Saturn does not give commission payments until Saturn receives payment from the customer.  (Krieger Aff. ¶ 15.)  Krieger left for vacation on January 15, 2010 and was not available to approve the commission payment until his return.  (*Id.*)  Plaintiff received the commission payment for this sale in February 2010 and admitted that Saturn was normally timely in its commission payments to her.  (*Id.*)

Plaintiff sometimes worked from home one day per week.  (Ds' 56.1 ¶ 19.)

Pappas and Krieger decided to terminate Plaintiff on December 4, 2009.  (Krieger Aff. ¶ 18.)

---

[6] Defendants make a number of brief, discrete statements of fact that are relevant to Plaintiff's allegations.

## II.  Discussion

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

"Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . [T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.") (alteration and internal quotation marks omitted).

B.  Discrimination

Title VII and NYHRL claims are analyzed under the same rubric. *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the [NYHRL] according to the same standards that we apply to Title VII discrimination claims."); *Williams v. City of N.Y.*, No. 11-CV-9679, 2012 WL 3245448, at *8

(S.D.N.Y. Aug. 8, 2012) ("[C]laims for violations of Executive Law § 296 are subject to exactly the same standards as claims under Title VII – so that if the Title VII claim is dismissed, the [NYHRL] claim must be dismissed as well."). Accordingly, I review both of Plaintiff's discrimination claims together.

Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At the *prima facie* stage, the burden of proof is minimal. *See id.* To make out a *prima facie* case of discrimination, a plaintiff must show that, "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009); *see Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 571 (S.D.N.Y. 2010).

Once a *prima facie* case is established, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis and alteration in original) (internal quotation marks omitted).

Once the defendant proffers a legitimate, non-discriminatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason

10

offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery*, 248 F.3d at 93. The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *See Reeves*, 530 U.S. at 143.

Plaintiff's claim for gender discrimination fails. I assume for the purposes of this Motion that Plaintiff has met her initial burden of establishing a *prima facie* case.[7] Defendants have also met their burden of setting forth legitimate, non-discriminatory reasons for their actions towards Plaintiff – *i.e.*, they terminated her for insubordination, poor performance, and her inability to accept criticism from her superiors, (*see* Krieger Aff. ¶ 9)[8] – and there is no evidence in the record indicating that any of these stated reasons are pretext. In other words, the allegations in

---

[7] It is not at all clear, however, that the facts in the record could give rise to an inference of discrimination. Nonetheless, in an abundance of caution, for the purposes of these Motions, I assume that Plaintiff has made out a *prima facie* case based on the allegations that some of her responsibilities were transferred to male employees after she was terminated. (*See* Krieger Aff. Ex. L, at 17 (Siegel took over Lockheed account after Plaintiff left).) *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis . . . .").

[8] Defendants have also set forth legitimate, non-discriminatory reasons for all of the other actions that Plaintiff mentions in the Complaint, many of which in any event do not rise to the level of adverse employment actions. (*See generally* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, (Doc. 64), 4-15.)

Plaintiff's Complaint – including that Defendants lied about her rights to unemployment benefits, terminated her based on her complaints about her webinar ID, denied her access to an attorney, stole personal information, bullied her, did not pay her travel expenses, refused to send her to the Tivoli training, delayed commission payments to her, and punched a wall when she made a sale,[9] (Compl. ¶ II.E)[10] – are either entirely unsubstantiated, or refuted by Defendants' legitimate explanations and evidence in support thereof, and in any event, do not even remotely suggest that Defendants' actions were taken based on Plaintiff's gender.

The few instances in which Plaintiff does allege that male employees were treated differently are either unsubstantiated, fail to create an inference of discrimination because there is no evidence that those male employees were similarly situated to Plaintiff, or both.  For example, Plaintiff alleges that Fitzgerald was sent to the Tivoli training over her, but the record supports Defendants' assertion that Fitzgerald was sent because he was hired specifically to sell Tivoli products and to build Saturn's software practice, (*see* Krieger Aff. ¶14; *id.* Ex. A, at 152; *id.* Ex. J; *id.* Ex. H, at 41, 43-44), and there is nothing to suggest that Tivoli was intended to be a central part of Plaintiffs' sales,[11] or that her focus lay in software rather than hardware, (*see id.* Ex. H, at 41-45, 50-51).

Likewise, Plaintiff alleges – although not in the Complaint – that male employees such as Lou Siegel were allowed to work from home while she was only allowed to work from home one

---

[9] Plaintiff makes a number of other allegations in the attachments to her Complaint and in her Memorandum of Law that are entirely unsubstantiated by evidence and wholly conclusory.  An assiduous review of the record has revealed that these allegations do not raise material issues of fact relating to Plaintiff's legal claims, and in the interest of brevity, I decline to set forth every convoluted allegation made by Plaintiff in her papers.

[10] "Compl." refers to Plaintiff's Complaint.  (Doc. 1.)

[11] While Plaintiff also had experience selling Tivoli software, (*see* Krieger Aff. Ex. A, at 14; *but see id.* Ex. A, at 29-31), there is no indication that she had any special expertise in this area, or that she was hired to sell Tivoli software as was Fitzgerald.

day per week. (P's Mem. 19-20.)[12] The record indicates that Plaintiff was not similarly situated to Siegel, however, because Siegel's commute was two hours each way, while Plaintiff's commute was fifteen minutes each way, (*see* Krieger Aff. Ex. A, at 112; *id.* Ex. L, at 8), and Siegel had a long tenure at Saturn with a "good track record,"[13] which, according to Pappas, was not comparable to Plaintiff's experience, (*id.* Ex. H, at 102-04). There is no evidence indicating that this reason might be pretext or suggesting that the decision to let Siegel and others[14] work remotely was based on gender rather than commute-time or employment history. Finally, Plaintiff alleges that she was paid less than Siegel, but the two are not similarly situated in this regard either, because Siegel had a longer tenure at Saturn and was hired under a different compensation structure. (Krieger Aff. ¶ 4; *id.* Ex. L, at 5, 25-26; *id.* Ex. B.) Further, the record indicates that Plaintiff was paid the same or more than male sales representatives with similar tenure. (Krieger Aff. ¶ 4.)

Thus, the record is devoid of any evidence that would suggest that Defendants' stated reasons for its actions are pretext or that Plaintiff was discriminated against in any way on the

---

[12] P's Mem refers to Plaintiff's Motion for Summary Judgment as a Matter of Law. (Doc. 80.)

[13] Even if Pappas told Plaintiff initially that she could work from home and then reneged on his promise, as Plaintiff alleges, (*see* Krieger Aff. Ex. A, at 107-11), that still does not tend to show gender discrimination.

[14] Plaintiff alleges that other male employees were allowed to work from home as well. The only one mentioned by name is Mike Cretty, who is discussed in Plaintiff's Equal Employment Opportunity Commission ("EEOC") complaint. (*See* Compl. at 20.) There is no other mention of Cretty in the record or any explanation as to why he is similarly situated to Plaintiff. Accordingly, this conclusory assertion will not suffice to raise an issue of fact with regard to pretext. *See Fujitsu*, 247 F.3d at 428 (plaintiff may not rely on conclusory allegations or unsubstantiated speculation at summary judgment stage); *see Lugo v. City of N.Y.*, No. 08-CV-5250, 2012 WL 3202969, at *4 (E.D.N.Y. Aug. 3, 2012) (list of seventeen allegedly non-Hispanic officers who were involved in shootings but not terminated did not suffice for purposes of opposing summary judgment because record lacked facts that could support conclusion that plaintiff and comparators were similarly situated). In fact, Defendants' stated reason is further supported by Pappas's testimony that he let two employees – Len Sofh-Ihos and Lenny Kellner – work from home because they lived three hours and one-and-a-half hours away from the office, respectively, but that in general, employees were all expected to work out of the office. (Krieger Aff. Ex. H, at 13-14.)

basis of her gender. Accordingly, Defendants' Motion is granted and Plaintiff's Motion is denied with respect to Plaintiff's discrimination claims.

### C. Hostile Work Environment

To the extent Plaintiff's Complaint may be read to state a hostile work environment claim, that claim fails for similar reasons. In determining whether a work environment was sufficiently hostile to violate Title VII, a plaintiff must show "(1) that the workplace was permeated with discriminatory intimidation sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive work environment; and (2) that a specific basis exists for imputing the conduct creating the hostile work environment to the defendant employer." *Hussain v. Long Island R.R.*, No. 00-CV-4207, 2002 WL 31108195, at *6 (S.D.N.Y. Sept. 20, 2002); *see Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997). As part of its inquiry, a court looks at "all the circumstances," including, but not limited to:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive.

*Cruz v. Oxford Health Plans, Inc.*, No. 03-CV-8863, 2008 WL 509195, at *7 (S.D.N.Y. Feb. 26, 2008) (internal quotation marks omitted). Finally, the incidents of allegedly offensive conduct must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).

Here, the only allegations suggestive of a hostile work environment are Plaintiff's allegations that Pappas "bullied" her and that Siegel punched a wall after Plaintiff made a sale.

First, even if Pappas's conduct could be viewed as abusive, there is nothing in the record to show that his conduct was based on, or related in any way to, Plaintiff's gender. In fact, Plaintiff herself attributed Pappas's conduct not to any discriminatory animus towards women, but to his "aggressive, New York personality," and admitted that he engaged in similar behavior with male employees such as Siegel. (Krieger Aff. Ex. A, at 100-105; *see also id.* Ex. H, at 87.) Similarly, the allegation that Siegel punched a wall is equally devoid of any connection to Plaintiff's gender. Accordingly, there being nothing in the record – no gender-based comments,[15] insinuations, or differential treatment – indicating that Plaintiff may have faced a hostile work environment due to her gender, Defendants' Motion is granted and Plaintiff's Motion is denied with respect to this claim.

    D.    Retaliation

Title VII prohibits employment discrimination based upon race, color, sex, national origin, religion, disability, or age, and also prohibits retaliation for complaining about discrimination based on any of those bases. 42 U.S.C. §§ 2000e *et seq.* Retaliation claims are also analyzed using the *McDonnell Douglas* burden-shifting framework. *Cruz*, 2008 WL 509195, at *10. To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that: (1) she was engaged in an activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff based upon her protected activity; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by Defendants.

---

[15] In her deposition, Plaintiff testified (although Siegel denied, (*see* Krieger Aff. Ex. L, at 13-14)), that Siegel would "occasionally" ask her if she was going to get married. Plaintiff has not alleged that this conduct constituted harassment, and indeed, there is nothing in the record to suggest that it constituted gender-based harassment or that Plaintiff was affected by it in any way. (*See id.* Ex. A, at 153-57.) If anything, Plaintiff seems more perturbed by Siegel's alleged use of profanity. (*See id.* Ex. H, at 48.) Further, Siegel was a peer of Plaintiff, (*see id.* Ex. A, at 91-92), and there is no apparent basis to attribute his conduct to Saturn. In any event, the occasional inquiries, as to which Plaintiff raised no complaint, (*see id.* Ex. A, at 156-57), could not amount to severe or pervasive harassment.

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). A plaintiff may establish the causal connection indirectly by showing that the protected activity was closely followed by discrimination, or directly by showing evidence of discriminatory animus. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

Plaintiff's retaliation claim fails because there is no evidence that Plaintiff engaged in any protected activity. A "protected activity" is one taken to "protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C. § 2000e-3). The "goal" of Title VII in prohibiting retaliation is to "forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 346 (S.D.N.Y. 2001) (internal quotation marks omitted). Plaintiff appears to allege that she suffered retaliation when she was terminated after her complaints about the webinar login and when she was directed to speak with Defendants' attorneys rather than individuals at Saturn after her termination.[16] (Compl. at 4, 15 (page 2 of EEOC letter); Krieger Aff. Ex. A, at 75-77.) Nowhere in Plaintiff's complaints about the webinar, however, is discrimination mentioned; Plaintiff's concerns about the webinar were related to its potential effect on sales; and it is undisputed that Defendants' actions in relation to the webinar were based on financial considerations and applied to all employees equally. Therefore, Plaintiff's complaints about the webinar login do not constitute protected activity.[17]

Likewise, Plaintiff's consultation with counsel after her termination cannot support a retaliation claim. Assuming that Plaintiff discussed discrimination with the lawyer, and further

---

[16] Plaintiff's submissions contain a plethora of unsubstantiated – and in some instances, incomprehensible – allegations about how she was wronged by Defendants. I am satisfied that none rises to the level of a plausible retaliation claim. I do not address each allegation individually in the interests of brevity and judicial economy, but rather focus only on the allegations in Plaintiff's Complaint.

[17] In fact, it appears that Plaintiff believes and/or suspects that her termination was based on a desire to give the Lockheed account to Siegel, rather than discriminatory animus. (*See, e.g.*, Krieger Aff. Ex. H, at 53-54.)

assuming the dubious proposition that statements made in confidence to third persons can qualify as protected activity, Saturn telling Plaintiff to communicate with Saturn through its counsel rather than through individual employees – a precaution routinely taken by prudent employers if they learn that an employee has contacted counsel – cannot constitute adverse employment action, especially where, as here, the employee had already been terminated.  *See Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) ("Adverse employment action," means a "materially adverse change in the terms and conditions of employment.") (citation omitted); *see also Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 639-640 (2d Cir. 2000) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (citations omitted).

In sum, the record is devoid of evidence that any actions taken by Defendants related to Plaintiff's gender or to protected activity.  Indeed, Plaintiff testified that her basis for believing she had been discriminated against is simply that she was terminated even though she was the "only female [sales rep] on the team, and [she] had produced results."  (Krieger Aff. Ex. A, at 135.)  Those allegations are wholly speculative and conclusory and do not suffice to create an issue of material fact.  *See, e.g.*, *Jimenez v. City of N.Y.*, 605 F. Supp. 2d 485, 522 (S.D.N.Y. 2009); *Gupta v. N.Y.C. Sch. Const. Auth.*, No. 04-CV-2896, 2007 WL 1827418, at *4 (E.D.N.Y. June 25, 2007), *aff'd*, 305 F. App'x 687 (2d Cir. 2008) (summary order).  Indeed, if they did suffice, every time a woman who worked in a "predominantly male" field suffered an adverse employment action, (*see* Krieger Aff. Ex. L, at 23), the employer would have to stand trial.

Accordingly, Plaintiff's discrimination, retaliation, and hostile work environment claims fail as a matter of law.

## III.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.   The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 63, 80), and close the case.

**SO ORDERED.**

Dated:  February 1, 2013
          White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.